**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGARET E. ALOPOGIANIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **No. 10 C 480** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Margaret Elizabeth Alopogianis ("Alopogianis"), brought this action to reverse or remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), who denied her claim for Supplemental Security Income ("SSI"). Alopogianis now seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Commissioner has filed a cross motion for summary judgment, requesting that this Court affirm his final decision. For the following reasons, Alopogianis's motion for summary judgment is granted [dkt. 19] and the Commissioner's motion for summary judgment is denied [dkt. 23].

**PROCEDURAL HISTORY**

On May 25, 2006, Alopogianis filed an application for SSI payments, alleging that she had been disabled since December 12, 1998.[1] Alopogianis sought SSI on the basis of bipolar disorder and anxiety disorder.[2] That claim was denied on October 18, 2006.[3] Alopogianis then filed a

---

[1]R. at 24.
[2]R. at 70.
[3]R. at 69-70.

Request for Reconsideration and the claim was again denied by notice dated January 19, 2007.[4]  On

January 19, 2007, Alopogianis filed a request for a hearing before an Administrative Law Judge

("ALJ").[5]

On March 9, 2009, a hearing was held before ALJ John L. Mondi in Oakbrook, Illinois.[6]

Following the hearing, the ALJ issued an unfavorable opinion on March 26, 2009, finding that

Alopogianis was not disabled under the Social Security Act.[7]  Alopogianis then filed a request for

review of the ALJ's determination with the Social Security Administration's Appeals Council on

May 6, 2009.[8]  On October 9, 2009, the Appeals Council denied the request for review, making the

ALJ's March 26, 2009 decision the final administrative determination of the Commissioner.[9]  On

December 21, 2009, the Appeals Council granted Alopogianis an additional thirty-five days to seek

review by the District Court,[10] and on January 25, 2010, Alopogianis filed this action.[11]

## FACTUAL BACKGROUND

### A. Medical Evidence

Medical evidence contained in the record consists of various medical reports by both

examining and non-examining medical professionals.   We note that the majority of this medical

evidence consists of mental assessments, with the exception of evidence that Alopogianis fractured

---

[4]R. at 90-92.
[5]R. at 93-94.
[6]R. at 32.
[7]R. at 24-31.
[8]R. 17-20.
[9]R. at 1-4.
[10]Comp., Ex. A [dkt 1].
[11]*See* Comp. [dkt 1].

her ankle in November 2008.[12]  On January 14, 2009, Regina Liebman, M.D. documented that the fracture was healed with a plate and four screws.[13]

*1. Lee Weiss, M.D.*

Lee Weiss**,** M.D. first examined Alopogianis on May 17, 2005.[14]  Hand-written notes from that examination indicate that Dr. Weiss diagnosed Alopogianis with adult attention-deficit hyperactivity disorder ("ADHD") and what appears to be dysthymia disorder.[15]  ADHD is "characterized by difficulties in sustained attention, concentration, and task completion.  It may also be accompanied by impulsiveness and hyperactivity."[16]  Dysthymia is a mood disorder, "less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years."[17]  Dr. Weiss prescribed Adderall to control the ADHD.[18]   He continued to treat Alopogianis at least once a month until and through the ALJ hearing.[19]

On September 19, 2008, Dr. Weiss completed a form at the request of the Social Security Administration, which required Dr. Weiss to make certain observations regarding Alopogianis's symptoms and diagnose her functional limitations.[20]  Dr. Weiss evaluated Alopogianis as having bipolar disorder and assigned her a Global Assessment of Function ("GAF") scale score between

---

[12]R. at 510.
[13]R. at 524.
[14]R. at 324-26.
[15]R. at 325.
[16]J.E. Schmidt, 1-A Attorneys' Dictionary of Medicine at A-12435 (Matthew Bender & Co. 2009).
[17]J.E. Schmidt, 2-D Attorneys' Dictionary of Medicine at D-37210 (Matthew Bender & Co. 2009).
[18]R. at 35.
[19]R. at 43.
[20]R. at 465-68.

55 and 60 out of 100.[21] Mental health professionals use the GAF scale to convey an individual's psychological, social, and occupational functioning on a spectrum in which scores between 41-50 indicate serious, 51-60 indicate moderate, and 61-70 indicate mild symptoms.[22] Bipolar disorder is defined as a "mood disorder marked by the occurrence of one or more manic episodes (irritable or elevated mood, excessive self-esteem, talkativeness) that alternate with major depressive episodes (loss of interest in one's activities, disturbance of sleep, loss of appetite, difficulty in thinking, etc.)."[23]

Dr. Weiss also assessed Alopogianis's functional limitations in terms of four categories. First, he noted a "moderate" limitation in restriction of activities of daily living.[24] Second, Dr. Weiss found a "marked" limitation in difficulties in maintaining social functioning.[25] Third, he stated that there were "frequent" deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner.[26] And fourth, he determined that there were "repeated (three or more)" episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from work or to experience an exacerbation of signs and symptoms.[27] The form also sought assessment of Alopogianis's mental abilities and aptitude to do unskilled work in terms of sixteen categories. In all sixteen categories, Dr. Weiss indicated that Alopogianis's aptitude was either poor or fair.[28]

---

[21]R. at 465.
[22]*See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR, 34 (4th ed. 2000).
[23]J.E. Schmidt, 1-B Attorneys' Dictionary of Medicine at B-16038 (Matthew Bender & Co. 2009).
[24]R. at 468.
[25]*Id.*
[26]*Id.*
[27]*Id.*
[28]R. at 467.

*2. Resurrection Behavioral Health Care*

The Social Security Administration also requested an evaluation from Resurrection Behavioral Health Care ("Resurrection").[29] Alopogianis was mandated to undergo treatment at Resurrection following an arrest for driving under the influence ("DUI") of alcohol.[30] In June 2005, when the program began, Alopogianis was assessed as having a substance abuse problem.[31]

As part of her treatment at Resurrection, Alopogianis underwent a psychiatric evaluation, which was conducted by Shabbir Zarif, M.D. on October 6, 2005.[32] After spending sixty minutes with Alopogianis, Dr. Zarif observed that Alopogianis exhibited abnormal behaviors, including asking other patients in the waiting area to watch her child and calling Resurrection staff pretending to be her husband in order to obtain information.[33] Generally, Dr. Zarif noted that Alopogianis was disengaged with the process and he struggled to get her to answer questions.[34] Dr. Zarif observed that it appeared as though Alopogianis was only seeking to comply with the court mandate and had no interest in resolving any of her issues.[35] In his conclusions, Dr. Zarif assigned Alopogianis a GAF score of 55 and stated that Alopogianis "may be just trying to do the least possible effort to get this over with. . ."[36] However, Dr. Zarif noted that two other possibilities existed: that she had a cognitive impairment (possibly attention deficit disorder) or a mental illness.[37] Although, she did

---

[29]R. at 327-62
[30]R. at 331.
[31]R. at 356.
[32]R. at 343-44.
[33]R. at 343.
[34]*Id.*
[35]R. at 344.
[36]*Id.*
[37]*Id.*

not seem to have a "clear-cut" mental illness.[38]  To resolve this question, Dr. Zarif recommended further psychological testing.[39]

Another psychiatric evaluation was conducted at Resurrection by William Egan, M.D. on January 25, 2006.[40]  After a forty-five minute exam, Dr. Egan observed that Alopogianis appeared anxious and that she described her mood as "a little depressed."[41]  Dr. Egan diagnosed Alopogianis with dysthymia, "R/O [rule out] bipolar II" disorder, and alcohol abuse.[42]  Bipolar II disorder is a "mood disorder characterized by one or more major depressive episodes and at least one hypomanic episode (a period of 4 days or longer during which the individual experiences an abnormally elevated mood, usually accompanied by grandiosity, rapid speech, increased distractibility, and psychomotor agitation)."[43]  He assigned her a GAF score of 52 and prescribed Lexapro (an antidepressant).[44]  On February 22, 2006, Dr. Egan conducted a fifteen minute follow-up exam.[45]  At the follow-up exam, the diagnoses remained unchanged.[46]  However, Dr. Egan added a new prescription of Depakote ER.[47]

Following discharge from Resurrection, Alopogianis continued to receive supervised visitation from Catholic Charities because there was some suspicion of child endangerment.[48]  Resurrection discharge documents also stated that Alopogianis was noncompliant with medication

---

[38]*Id.*
[39]*Id.*
[40]R. at 336-38.
[41]R. at 336.
[42]R. at 337.
[43]J.E. Schmidt, 1-B Attorneys' Dictionary of Medicine at B-16043  (Matthew Bender & Co. 2009).
[44]R. at 337, 338; J.E. Schmidt, 3-L Attorneys' Dictionary of Medicine at L-67462 (Matthew Bender & Co. 2009).
[45]R. at 425.
[46]*Id.*
[47]*Id.*
[48]R. at 331.

and therapy services.[49]  The documents further stated that Alopogianis "persistently failed to follow through with treatment recommendations."[50]

### 3. Clinical Psychologist Nicole A. Leisgang

On December 14, 2006, Alopogianis was seen by clinical psychologist Nicole A. Leisgang, Psy.D.[51]  Dr. Leisgang stated Alopogianis's pressured and circumstantial speech strongly suggested a manic episode.[52]  She also observed that Alopogianis was anxious.[53]  Dr. Leisgang assigned Alopogianis a GAF of 49.  She concluded that Alopogianis's ability to relate to others including fellow workers and supervisors, her ability to understand, remember, and follow simple instructions, and her ability to withstand the stress and pressure associated with day-to-day work activities were moderately to seriously impaired.[54]  Dr. Leisgang also determined Alopogianis's ability to maintain attention, concentration, persistence, and pace was moderately impaired.[55]

### 4. Non-examining Physicians

A number of reports were also completed by non-examining physicians. First, R. Leon Jackson, Ph.D. completed a Psychiatric Review Technique ("PRT") form on June 7, 2005.[56]  His

---

[49]*Id.*
[50]*Id.*
[51]R. at 377-82.
[52]R. at 380.
[53]*Id.*
[54]R. at 381-82.
[55]R. at 381.
[56]R. at 489-502.

conclusion was that there were insufficient medical records to validate claims of ADHD, anxiety, and depression.[57]  When asked to evaluate Alopogianis's degree of limitation in the four functional limitation categories, such as restriction of activities of daily living, Dr. Jackson marked "Insufficient Evidence" for all four categories.[58]  Dr. Jackson provided no discussion other than that there was insufficient evidence.[59]  It is unclear, therefore, what records Dr. Jackson reviewed.[60]  On October 6, 2006 a non-examining doctor, Russel Taylor, Ph.D., also completed a PRT form.  Again, Dr. Taylor concluded that there was "Insufficient Evidence" to assess Alopogianis's medical disposition, and again it is unclear what records Dr. Taylor examined.[61]

On January 1, 2007, non-examining reviewer Bruce Goldsmith, Ph.D. completed a PRT form.[62]  Dr. Goldsmith indicated that Alopogianis suffered from affective disorders and anxiety disorders.[63]  He also determined that Alopogianis presented the medically determinable impairment of bipolar disorder.[64]  He noted that Alopogianis suffered from panic disorder,[65] "[a] mental disorder marked by recurring attacks of panic (overpowering freight). . . ."[66]  In assessing her functional limitations, Dr. Goldsmith reached the following conclusions: a "mild" limitation in restriction of activities of daily living; a "moderate" limitation in difficulties in maintaining social functioning;

---

[57]R. at 489
[58]R. at 499.
[59]R. at 501.
[60]R. at 489-502.
[61]R. at 363-75.
[62]R. at 383-96.
[63]R. at 383.
[64]R. at 386.
[65]R. at 388.
[66]J.E. Schmidt, 4-P Attorneys' Dictionary of Medicine at P-86580 (Matthew Bender & Co. 2009).

a "moderate" limitation in difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.[67]

Dr. Goldsmith also completed a Mental Residual Functional Capacity Assessment, which assessed Alopogianis's limitations in twenty mental activities.[68]  On the form, Dr. Goldsmith was required to assess  her abilities in these categories as either "not significantly limited," "moderately limited," "markedly limited," "no evidence of limitation," or "not rateable on available evidence."[69]  Dr. Goldsmith concluded that Alopogianis was "moderately limited" in nine of the categories, such as the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to interact with the general public, and the ability to respond appropriately to changes in the work setting.[70]  The remaining eleven categories were noted as "not significantly limited."[71]   In his remarks, Dr. Goldsmith stated, "[s]hould she ever agree to medication and counseling, she would improve significantly.  At any rate, at this time she would be capable of working at a steady pace to sustain at least simple tasks."[72]

**B. Hearing Testimony**

At the hearing before ALJ Mondi, testimony was taken from Alopogianis and a medical expert, Kathleen O'Brien, Ph.D.

*1. Alopogianis's Testimony*

---

[67]R. at 393.
[68]R. at 397-400.
[69]R. at 397-98.
[70]*Id.*
[71]*Id.*
[72]R. at 399.

Alopogianis testified that she is forty-five years old, is separated from her husband, and has four children.[73] The children are ages eighteen, sixteen, ten, and six years old.[74] However, Alopogianis stated that she resides only with the youngest child.[75] The other three children live with her sister.[76] Alopogianis testified that she completed high school and two years of college.[77] She stated that the last time she worked was approximately one year prior to her testimony at a Burger King restaurant.[78] However, she lasted only one month because, according to Alopogianis, she was suffering from depression and the work environment was too stressful.[79] Alopogianis stated that she stopped drinking around 2004, had not relapsed, and was attending alcoholics anonymous ("AA") therapy meetings.[80] Alopogianis further testified that with a fully healed ankle, she would still have problems standing for prolonged periods of time due to what she called arthritis and back pain.[81] At the time of her testimony, she had been seeing Dr. Weiss for four years and she believed that he had helped her.[82] Alopogianis stated that in addition to her depression, she gets nervous or anxious.[83] She stated that she enjoys swimming and has attempted to teach others to swim.[84] She testified that swimming helps with her depression.[85]

*2. Dr. O'Brien's Testimony*

---

[73]R. at 37.
[74]*Id.*
[75]R. at 44.
[76]*Id.*
[77]R. at 37.
[78]R. at 39.
[79]R. at 39-40, 47-49.
[80]R. at 41.
[81]R. at 42.
[82]R. at 43.
[83]R. at 49.
[84]R. at 45, 50.
[85]R. at 45.

Dr. O'Brien reviewed Alopogianis's medical records and asked Alopogianis a few questions prior to testifying.[86] During her testimony, Dr. O'Brien noted that Alopogianis was diagnosed with three different mood disorders: dysthymia, depression, and bipolar disorder and, therefore, she opined that Alopogianis had an ongoing diagnosis of one or another type of mood disorder.[87] Dr. O'Brien also noted that there were diagnoses of generalized anxiety disorder and Alopogianis's self reported adult onset ADHD.[88] When asked about Dr. Weiss's diagnoses of ADHD, Dr. O'Brien responded that there was no indication that there had been any testing to reach a diagnosis of ADHD and, therefore, Dr. O'Brien appeared to disregard Dr. Weiss's ADHD diagnosis.[89] In Dr. O'Brien's opinion, Alopogianis appeared to be responsive to treatment and medication but at times was uncooperative in treatment.[90] In terms of work limitations, Dr. O'Brien stated that Alopogianis has "some function limitations in terms of pace."[91] However, Dr. O'Brien believed she could maintain an "average" pace so long as it was not "high paced."[92] Dr. O'Brien further noted that there may be some moderate limitations in social interaction as well.[93] She concluded that Alopogianis's impairments did not meet or equal any listed impairment in the Social Security Administration Regulations ("Regulations") that would deem her disabled.[94]

## ALJ'S DECISION

---

[86] R. at 53-57.
[87] R. at 57.
[88] *Id.*
[89] R. at 60.
[90] R. at 58.
[91] R. at 59.
[92] R. at 59,64-65.
[93] R. at 59, 64-65.
[94] R. at 58-59.

In his March 26, 2009 decision, ALJ Mondi determined that Alopogianis was not disabled as defined in the Social Security Act and, therefore, was not entitled to any SSI. [95]  In reaching this conclusion, the ALJ followed the five-step evaluation process outlined in the Regulations.[96]  Under the Regulations, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[97]  A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[98]

At step one, the ALJ found that Alopogianis had not engaged in substantial gainful activity since May 25, 2006.[99]  At step two, because Alopogianis had a mood disorder and a history of drug and alcohol abuse, the ALJ determined that she had a severe mental impairment.[100]  The broken ankle, however, would not be considered part of her severe impairment because she was expected to make a complete recovery within twelve months.[101]

Despite finding severe mental impairments, the ALJ found that Alopogianis failed the third step of the process because she lacked an impairment or combination of impairments that amounted

[95]R. at 24-31.
[96]R. at 24; 20 C.F.R. § 416.920.
[97]20 C.F.R. § 416.920.
[98]*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992).
[99]R. at 26.
[100]R. at 27.
[101]*Id.*

to one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[102] To reach this conclusion the ALJ looked at both "paragraph B" criteria and "paragraph C" criteria in the Regulations to determine whether she met the listings.[103] To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[104] "Marked" is defined as more than moderate but less than extreme.[105] "Repeated episodes of decompensation, each of extended duration" is defined as either three episodes within one year or an average of once every four months, each lasting for at least two weeks.[106]

In this case, the ALJ found that the overall record reflected that Alopogianis had no restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace.[107] For support, the ALJ noted that Alopogianis was able to care for her son, enjoyed reading and writing, completed household chores, and had regular contact with her family.[108] Further, the ALJ noted that Alopogianis was a full-time mother and occasionally baby sat other children.[109] Finding that Alopogianis's impairment did not cause at least two of the requirements in "paragraph B", the ALJ concluded that "paragraph B" requirements were not met.[110]

---

[102] R. at 27-28.
[103] Id.
[104] 20 C.F.R. Pt. 404, Subpt. P, App. 1; 20 C.F.R. §§ 416.925, 416.926..
[105] 20 C.F.R. Pt. 404, Subpt. P, App. 1.
[106] Id.
[107] R. at 27.
[108] Id.
[109] Id.
[110] Id.

The ALJ also concluded that the criteria for "paragraph C" were not met.[111] To satisfy the "paragraph C" criteria the claimant must have a "[m]edically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities" plus one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. In concluding that Alopogianis did not meet "paragraph C" criteria, the ALJ stated only "the evidence fails to establish the presence of the 'paragraph C' criteria." The ALJ noted Dr. O'Brien's finding that Alopogianis did not meet the listings as further support for his conclusion that she did not meet "paragraph B" and "paragraph C" criteria.[112]

The ALJ next determined plaintiff's residual functional capacity ("RFC").[113] A claimant's RFC represents what work a claimant can perform despite his or her physical or mental limitations.[114] The ALJ found that Alopogianis had the RFC to work at all exertional levels subject to a limitation to simple unskilled work involving no more than incidental social contact.[115] In reaching this conclusion, the ALJ noted that Alopogianis had been noncompliant with treatment as noted by Dr. Zarif.[116] The ALJ stated that Dr. Leisgang had diagnosed Alopogianis with bipolar II disorder, but observed that Dr. Leisgang relied heavily on Alopogianis's subjective report of her

---

[111]*Id.*
[112]R. at 27.
[113]R. at 28-29.
[114]20 C.F.R. § 416.945.
[115]R. at 28.
[116]R. at 28-29.

own symptoms.[117]  As for Dr. Weiss, the ALJ conceded that Dr. Weiss's opinion would support a finding of disabled.[118]  However, the ALJ stated Dr. Weiss's opinion was not well supported by treatment records and was inconsistent with other evidence.[119]  The ALJ also found Dr. Weiss's opinion less persuasive because it was not accompanied with any treatment notes between the period of 2006 to 2008.[120]  Ultimately, the ALJ relied heavily on Dr. O'Brien's testimony in reaching his RFC conclusion.[121]  Specifically, he noted that Dr. O'Brien pointed out that Alopogianis was not cooperative with treatment.[122]  Dr. O'Brien's opinion that Alopogianis was improving while on medication was also persuasive to the ALJ.[123]  The ALJ further relied on Dr. O'Brien's reference to the fact that Alopogianis cared for four children and baby sat other children.[124]  (But, we note that the evidence is clear that Alopogianis lived only with her youngest child).[125]  Further, the ALJ pointed to Dr. Goldsmith's report, which concluded that Alopogianis's limitations were mild in activities of daily living and moderate in social functioning and concentration persistence and pace.[126]  The ALJ also stated that Dr. Goldsmith had found no episodes of deterioration and concluded that Alopogianis could perform unskilled work.[127]  Because the ALJ found these conclusions consistent with the other medical evidence, he adopted the findings.[128]  Finally, the ALJ

---

[117]R. at 29.
[118]*Id.*
[119]R. at 29.
[120]*Id.*
[121]*Id.*
[122]*Id.*
[123]*Id.*
[124]*Id.*
[125]*Id.*
[126]*Id.*
[127]*Id.*
[128]*Id.*

concluded that given the objective evidence presented, Alopogianis's testimony of her symptoms was not credible.[129]

Having determined Alopogianis's RFC, the ALJ proceeded to step four to determine whether she could perform any past relevant work, but Alopogianis lacked past relevant work.[130] Moving to step five, the ALJ determined that a significant number of jobs existed in the economy, which Alopogianis could perform.[131] In reaching this conclusion, the ALJ used the Medical-Vocational Guidelines ("Guidelines").[132]

The Guidelines list exertional maximums and dictate a finding of "disabled" or "not disabled" based on the claimant's specific vocational profile, which comprises of the claimant's age, education, and work experience.[133] However, strict use of the Guidelines can only be used when the claimant can perform all or substantially all of the exertional demands at a given level of exertion.[134] If the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion, the Guidelines are used only as a framework.[135] When limitations are solely non-exertional, section 204.00 provides a framework for reaching a decision.[136]

Here, the ALJ concluded that Alopogianis could perform work physically at all exertion levels.[137] The ALJ stated that "[w]hile claimant has additional non-exertional limitations, they are

[129]*Id.*
[130]R. at 30.
[131]R. at 30.
[132]R. at 30*; 20 C.F.R. Part 404, Subpt. P, Appendix 2; 20 C.F.R. §§ 416.969, 416.969a.
[133]Social Security Ruling (SSR) 83-11.
[134]SSR 83-12; SSR 83-14.
[135]SSR 83-12; SSR 83-14.
[136]SSR 85-15; 20 C.F.R. Pt. 404, Subpt. P, App. 2.
[137]R. at 30.

not such that they would compromise the wide range of work otherwise available."[138]  Therefore, the ALJ concluded that because plaintiff was capable of performing other work, she was not disabled at any time since May 25, 2006.[139]

## STANDARD OF REVIEW

The Court performs a de novo review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[140]  The District Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal error.[141]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate finding as to disability.[142]  However, the ALJ must make an accurate and logical connection from the evidence to the ultimate conclusion.[143]  While, the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of disability.[144]

## ANALYSIS

Alopogianis raises three issues.  First, she contends that the ALJ's credibility finding was erroneous, arbitrary, and not supported by the medical evidence.  Second, Alopogianis argues that the ALJ improperly rejected opinions of the treating and examining physicians.  Third, Alopogianis argues that the ALJ improperly relied on the Guidelines.

### A. The ALJ's Credibility Finding

[138]*Id.*
[139]R. at 30-31.
[140]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[141]42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[142]*Cass v. Shalala,* 8 F. 3d 552, 555 (7th Cir. 1993).
[143]*Dixon v. Massanori*, 270 F. 3d 1171, 1176 (7th Cir. 2001).
[144]*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

We start with the ALJ's credibility finding with regard to Alopogianis's testimony. Generally, an ALJ's credibility determinations are entitled to special deference.[145] However, when weighing the claimant's testimony,

> the ALJ must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain. Further, the ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.[146]

Furthermore, the ALJ's reasoning, "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[147] We note that when making a credibility determination, simple boiler plate language, that fails to elicit what weight the trier of fact gave to the testimony, is unacceptable.[148] The ALJ's credibility determination must contain specific reasons that are supported by the evidence.[149] Specifically, Social Security Ruling ("SSR") 96-7p sets out the following seven factors to be considered when making a credibility determination: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the alleged symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) other treatment the claimant has received; (6) other measures taken to alleviate the symptoms; and (7) other factors concerning the individual's functional limitations.[150] In reaching

---

[145]*Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010).

[146]*Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

[147]SSR 96-7p at *4; *see also Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008).

[148]*Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010)(finding "after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" to be boilerplate language.).

[149]*Craft,* 539 F.3d at 678.

[150]SSR 96-7p.

his conclusion, the ALJ must build "an accurate and logical bridge between the evidence and the result."[151]

In this instance, the ALJ found that the "[c]laimant's testimony of symptoms and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible in establishing disabling limitations..."[152] The ALJ listed Dr. O'Brien's assessment that Alopogianis improved with medication and Alopogianis's current activities as reasons for discrediting her testimony. The ALJ, therefore, resisted the use of the boilerplate language specifically prohibited by the Seventh Circuit. However, the ALJ still failed to provide specific explanations to allow this Court insight into his reasoning. Although the medical expert, who never truly examined Alopogianis, commented that she seemed to improve with medication, there is no "bridge" from this fact to the conclusion that Alopogianis's testimony is not credible. Furthermore, the "current activities" listed earlier in the ALJ's opinion include caring for only one of her four children, watching television, listening to music, reading and writing, household chores, and regular contact with family.[153] The ALJ fails to articulate how Alopogianis's ability to watch television, listen to music, or complete any of the other activities contradicts her testimony that she suffers from depression, nervousness and anxiety to the extent she is unable to work.[154] Our view into the ALJ's reasoning is further obstructed by the ALJ's statement that, "[t]he medical expert pointed to references of the claimant caring for 4 children...."[155] However, it is clear from Alopogianis's testimony that she cares for only one of her children. Furthermore, the ALJ stated elsewhere in his

---

[151]*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).
[152]R. at 29.
[153]R. at 27.
[154]R. at 49.
[155]R. at 29.

opinion that only the youngest child lived with Alopogianis.[156]  We, therefore, conclude that the

ALJ's discussion regarding Alopogianis's credibility is insufficient.

## B. Improper Rejection of Examining Physicians' Opinions

Alopogianis next argues that the ALJ failed to provide sufficient reasons for rejecting the

treating and examining physicians' opinions.  She further claims that this improper rejection led to

an erroneous finding that she did not meet the listings and led to an incorrect RFC finding.  She then

argues that the ALJ relied solely on the non-examining opinions and Dr. O'Brien's testimony, and

that this evidence alone cannot be substantial evidence to support his decision.

Generally, a treating physician's opinion is given the greatest weight.[157]  In fact, "[a] treating

physician's opinion regarding the nature and severity of a medical condition is entitled to controlling

weight if it is well supported by medical findings and not inconsistent with other substantial

evidence in the record."[158]  Treating physicians' opinions are entitled to greater weight "because of

their greater familiarity with the claimant's conditions and circumstances."[159]  However, "[a] case

cannot be decided in reliance on a medical opinion without some reasonable support for the

opinion."[160] Similarly, the opinion of a source that has examined the claimant will be given more

weight than an opinion of a source that has not examined the claimant, and an ALJ cannot reject the

opinion of an examining physician solely on the basis of a contradictory opinion of a non-examining

physician.[161]  Instead, to reject an examining physician's opinion the ALJ must cite to substantial

---

[156]R. at 26.
[157]20 C.F.R. § 416.927(d).
[158]*Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also* 20 C.F.R. § 416.927(d).
[159]*Gudgel*, 345 F.3d 467 at 470(*citing Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)); *see also* 20 C.F.R. § 416.927(d).
[160]SSR 96-2p.
[161]*Gudgel*, 345 F. 3d at 470; *see also* 20 C.F.R. § 416.927(d)..

evidence in the record.[162]  Whether weight will be given to a nonexamining physician will depend

on the degree to which the physician provided supporting explanations for his or her opinion.[163]  The

ALJ should also evaluate the extent to which the nonexamining opinions consider all of the pertinent

evidence, such as opinions from treating and examining physicians.[164]  We note that,

> [t]he regulations provide progressively more rigorous tests for weighing opinions as the ties
> between the source of the opinion and the individual become weaker.  For example, the
> opinions of physicians or psychologists who do not have a treatment relationship with the
> individual are weighed by stricter standards, based to a greater degree on medical evidence,
> qualifications, and explanations for the opinions, than are required of treating sources.[165]

Finally, whether crediting or discrediting evidence of disability, the ALJ must "minimally articulate"

his reasons for doing so.[166]  When deciding whether to accept or reject evidence of disability,

important factors for the ALJ to consider are how frequently the physician saw the patient, whether

the physician is a specialist on the relevant medical issues, the sufficiency of the physician's

explanation of his or her opinion, and the consistency of the opinion with the record as a whole.[167]

In this case, Dr. Weiss was the treating physician.  The ALJ conceded that Dr. Weiss's

opinion would support a finding of disabled, but discredited that opinion because of a lack of therapy

notes.[168]  The ALJ also stated that Dr. Weiss's opinion is inconsistent with other substantial

evidence.[169]  As noted earlier, the treating physician's opinion is entitled to controlling weight only

if it is well supported by medical findings and not inconsistent with other substantial evidence in the

---

[162]*Id.*
[163]20 C.F.R. § 404.1527(d)(3).
[164]*Id.*
[165]SSR 96-9p.
[166]*Clifford,* 227 F.3d at 871.
[167]20 C.F.R. §§ 404.1527(d)(1)-(6).
[168]R. at 29.
[169]*Id.*

record. Without therapy notes, we think it was appropriate for the ALJ to conclude that the opinion was not entitled to controlling weight. However, we still believe Dr. Weiss's opinion is entitled to significant weight because he was Alopogianis's treating physician for four years.[170] Furthermore, we do not believe the ALJ has minimally articulated how Dr. Weiss's opinion was contradicted by substantial evidence. In fact, the ALJ does not say *what* is inconsistent, only that there is inconsistent substantial evidence. The ALJ states that Dr. O'Brien noted that Alopogianis was uncooperative with her post-DUI program at Resurrection. However, the ALJ does not discuss how this is inconsistent with Dr. Weiss's opinion. We think the ALJ needed to articulate further how observations that a patient is uncooperative at a post-DUI program is inconsistent with a treating physician's finding that she is bipolar and has serious limitations. It is conceivable to the Court that an individual with a mental impairment would be uncooperative with physicians. We, therefore, conclude that the ALJ did not minimally articulate how Dr. Weiss's opinion is inconsistent with other substantial evidence in the record.

The Seventh Circuit's recent opinion in *Spiva v. Astrue* further persuades us that a more complete analysis is needed.[171] The ALJ in *Spiva* concluded that the claimant suffered from schizophrenia, dsythymia, psychosis, and attention deficit disorder.[172] Yet, the ALJ found that the claimant was not disabled because the claimant was a malingerer.[173] This conclusion was based on observations that the claimant was vague or evasive when questioned about his illness and failed to take his medications.[174] However, the Seventh Circuit noted that the claimant "being vague or

---

[170]R. at 43.
[171]No. 10-2083, 2010 WL 4923563, at *1 (7th Cir. Dec. 6, 2010).
[172]*Spiva*, 2010 WL 4923563 at *1.
[173]*Id.*
[174]*Id.*

evasive when questioned about his illness could be evidence of malingering, but equally could reflect the effects of his psychotic mentation."[175] Further, reference to the claimant's "failing to take his medications ignores one of the most serious problems in the treatment of mental illness-the difficulty of keeping patients on their medications."[176] While we acknowledge the symptoms suffered by the claimant in *Spiva* are more severe than Alopogianis's symptoms, we note that all of the doctors in the *Spiva* case opined that the claimant was capable of working.[177] Alopogianis's doctors, however, do not all agree that she can work. Yet the Seventh Circuit still saw it fit to remand in *Spiva* and, therefore, we are convinced further analysis by the ALJ is appropriate here as well. We emphasize that we are not concluding that Alopogianis is disabled, that domain is reserved for the ALJ. We simply believe that a more thorough analysis is needed to allow this Court to properly review the ALJ's determination.

The ALJ also found the opinion of Dr. Goldsmith, a non-examining physician, persuasive.[178] However, the ALJ does not provide much analysis of Dr. Goldsmith's opinion, stating only that it is consistent with other evidence.[179] Dr. Goldsmith is a non-examining physician and, thus, the ties between him and Alopogianis are fairly weak. Therefore, his opinion should have been weighed by stricter standards and the ALJ should have "minimally articulated" why Dr. Goldsmith's opinion passed those stricter standards.[180] Provided with a further analysis, this Court could engage in a more meaningful review.

---

[175]*Id.* at *4.
[176]*Id.*
[177]*Id.* at *5.
[178]R. at 383-400.
[179]R. at 29.
[180]*Clifford*, 227 F.3d at 870 (7th Cir. 2000)

We also question the ALJ's treatment of Dr. Leisgang's opinion. Dr. Leisgang, an examining physician, also concluded that Alopogianis suffered from bipolar disorder and observed Alopogianis to suffer from fairly severe symptoms.[181] Yet, the ALJ dismisses this evidence because Dr. Leisgang "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."[182] As we discussed *supra*, the ALJ found Alopogianis's subjective complaints unreliable. However, we concluded that the ALJ's analysis of Alopogianis's credibility was insufficient. Therefore, we find discrediting Dr. Leisgang's opinion based on this analysis equally insufficient.

## C. Use of the Guidelines

Alopogianis's final argument is that the ALJ improperly relied on the Guidelines. As stated previously, if the claimant suffers from non-exertional limitations only, then the Guidelines may be used as a framework to determine if the claimant is disabled.[183] However, the ALJ cannot rely on the Guidelines and must consult a vocational expert if the "non-exertional limitation might substantially reduce a range of work an individual can perform."[184]

Here, the ALJ defined Alopogianis's RFC in the following manner: "[t]he claimant has the residual functional capacity to work at all exertional levels subject to a limitation to simple unskilled work involving no more than incidental social contact."[185] Then, the ALJ used the Guidelines as a

---

[181]R. at 377-82.
[182]R. at 29.
[183]SSR 85-15; 20 C.F.R. Pt. 404, Subpt. P, App. 2., §204.00.
[184]*Luna v. Shalala*, 22 F.3d 687, 691(7th Cir. 1994).
[185]R. at 28.

framework and found that although non-exertional limitations existed, they would not compromise the wide range of work otherwise available.[186]  Alopogianis objects to the use of the Guidelines, arguing that her non-exertional limitations preclude the use of the Guidelines and that the ALJ should have instead consulted a vocational expert.  The Commissioner maintains that the non-exertional limitations do not significantly affect the unskilled job base.

We do not agree with Alopogianis here.  As stated, an ALJ is required to consult a vocational expert where a non-exertional limitation might substantially reduce the range of work an individual can perform.[187]  Here, the ALJ determined that Alopogianis was limited to jobs that involved no more than incidental social contact.  While SSR 96-9p states that responding appropriately to supervision, co-workers and usual work situations is a mental activity generally required for competitive, remunerative, unskilled work,[188] "no more than incidental social contact" does not mean that she is not capable of engaging these limited social interactions.  The word "incidental" is defined as "being likely to ensue as a chance or minor consequence" or "minor."[189]  It does not mean that she cannot engage in *any* social contact, only that her social interactions should be limited. Therefore, we think the ALJ did not err when he concluded that this limitation would not "compromise the wide range of work otherwise available."[190]  However, we note that on remand, the RFC assigned to Alopogianis may change, which may make it necessary to consult a vocational expert in accordance with the Regulations.

---

[186]R. at 30.
[187]*Luna*, 22 F.3d at 691.
[188]SSR 96-9p at 9.
[189]Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/incidental (last visited Jan 3, 2011).
[190]R. at 30.

Alopogianis also argues that use of the Guidelines was inappropriate because she is unable to perform work physically at all exertional levels because of her arthritis, back pain, and recent ankle fracture. First, we note that the ALJ found that the ankle fracture was not likely to extend beyond twelve months, thereby not qualifying as a disability.[191] Furthermore, Alopogianis submitted no evidence that suggests the ankle fracture was likely to extend beyond twelve months. Second, the only evidence of arthritis and back pain is Alopogianis's own testimony. Alopogianis did not provide any evidence that would establish a medically determined impairment that could reasonably be expected to produce the pain described by Alopogianis.[192] Therefore, the ALJ did not err in finding no exertional limitations.

Finally, Alopogianis argues that the ALJ was required to conduct an assessment of Alopogianis's Mental Residual Functional Capacity ("MRFC"). Alopogianis cites to no law to support this argument, but we will address it briefly. Previously, an ALJ was required to complete a standard document outlining the steps of the mental impairment assessment.[193] However, the Regulations have since been amended, and instead of requiring the ALJ to complete a standard document, the ALJ need only conduct a "special technique."[194] "The technique requires the ALJ to determine if the applicant has a 'medically determinable mental impairment,' and if so, to rate the applicant's degree of functional limitation in four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."[195] As discussed previously,

---

[191]20 C.F.R. § 404.1505 (defining disability as an impairment that can be expected to last for a continuous period of not less than twelve months).

[192]*Indoranto v. Barnhart*, 374 F.3d 470, 474 (stating that, "the ALJ must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain").

[193]*Stambaugh on Behalf of Stambaugh v. Sullivan,* 929 F.2d 292, 295-96 (7th Cir. 1991).

[194]20 C.F.R. § 416.920a(a); *see also Burke v. Astrue*, 306 Fed. Appx. 312, *2 (7th Cir. 2009).

[195]*Burke*, 306 Fed. Appx. 312, *2 (7th Cir. 2009)(citation omitted)(quoting 20 C.F.R. § 416.920a(b)(1)).

the ALJ conducted an analysis of these four categories and determined that Alopogianis had no restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration persistence or pace, and no episodes of decompensation of extended duration.[196]  Therefore, we find the ALJ's decision sufficient in this respect as well. Although, again, upon remand these findings may change.

## CONCLUSION

For the reasons explained above, Alopogianis's motion for summary judgment is granted [dkt. 19], and the Commissioner's motion for summary judgment is denied [dkt. 23].  We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED**.

**ENTERED: <u>January 6, 2011</u>**

**UNITED STATES MAGISTRATE JUDGE**

**Susan E. Cox**

---

[196]R. at 27.